272 P.2d 313

**DOYAL v. HOBACK et al.**

No. 8109.

Supreme Court of Idaho.

July 9, 1954.

432

James G. Towles, Kellogg, for appellant.

Philip E. Dolan, Coeur d'Alene, for Liberty Nat. Ins. Co.

Tom B. Payne, Wallace, for Hobacks.

TAYLOR, Justice.

The defendants, Ford S. and Mary Hoback, were engaged in a merchandising

business at Kellogg, Idaho, under the name of Kellogg Variety Store. Liability to their employees, under the Workmen's Compensation Act, I.C. § 72–101 et seq., was insured by the defendant, Liberty National Insurance Company. During the year 1949, Mr. Hoback, with about ten other residents of Wallace, all being owners of floathouses on Lake Coeur d'Alene, made arrangements with the owners of adjacent land to tie their boats up at Beauty Bay on the lake. These floathouses were used by their owners as summer homes for the convenience and enjoyment of their families, friends and associates.

This unorganized group employed a watchman to look after their floathouses and to keep trespassers out. Each of the group contributed $5 per month to a fund for expenses. Out of this the watchman was paid $50 per month. The wages of the watchman were actually paid by Mr. Hoback, he being reimbursed by the other members for their shares. The group, desiring to insure the watchman under workmen's compensation, Mr. Hoback consulted the local agent of his insurer at Wallace and was advised by him to put the watchman on his variety store payroll. It appears from the record that the agent at Wallace was the sub-agent of the Gridley Investment Company at Coeur d'Alene, which in turn was the general agent of the surety company. The claimant was employed by Hoback as watchman for the group about July, 1950. Mr. Hoback included the wages of the watchman in his payroll reports along with wages paid to employees of the variety store. On such reports the employees were variously designated as "clerks, variety store", "variety store employees". The individual employees were not named, nor were their respective duties otherwise described. Neither the employer nor the local agent of the surety ever informed the general agent or the insurance company that the payroll included the wages of the watchman at Beauty Bay. The premiums were based upon the rates charged for store employees. The rate for a watchman was higher. On January 13, 1953, the claimant fell on the dock at the Hoback floathouse and suffered injury. Thereafter, and on January 27, 1953, in his payroll report for the year 1952, employer Hoback reported the salary of the watchman as a separate item for the first time.

The surety denied liability on the ground that the claimant was not engaged in covered employment: (a) That he was not an employee of the insured in their variety store business at Kellogg; (b) that he was engaged in employment not covered by the act, § 72–105a, I.C., in that he was engaged in "household domestic service", subsection 2; that he was engaged in "employment which is not carried on by the employer for the sake of pecuniary gain", subsection 8; and that no election was ever made or filed by the employer and surety, that the

provisions of the act should apply, as required by § 72–105b, I.C.

After hearing, the Board found as follows:

"The employment was of a type of domestic service. Claimant was a watchman, of a private summer resort, himself being resident on the premises, his lodging being furnished. His only well defined duty was to keep away trespassers and thieves. Incidentally he performed a few repairs, sufficient at least to cause him to be sometimes designated as caretaker. He was not, however, under the duty of doing any specific work for any of the eleven or more homeowners who composed the group which employed him, each of whom owned his own floathouse and its connection with the shore. Only three of the group are shown to have been engaged in business or industry as 'employers.' Doyal's employment had no direct connection with any of them. The group's operation was not profit-motivated; it was not for the sake of pecuniary gain, as it would have been if the floathouses were rented out to tenants."

It is admitted that no election of coverage was made. Therefore, if the employment was within either of the exempt classifications mentioned in the statute, no compensation could be awarded by the Board. Kindall v. McBirney, 52 Idaho 65, 11 P.2d 370.

If supported by substantial and competent evidence, the Board's finding as to the character of the employment is binding upon this court. Art. 5, § 9, Const.; § 72–608, I.C.; Shumaker v. Hunter Lease & Gold Hunter Mines, 72 Idaho 173, 238 P.2d 425; Nitkey v. Bunker Hill & Sullivan, etc., Co., 73 Idaho 294, 251 P.2d 216.

Claimant testified that he was employed to look after all of the floathouses. Although he regarded Hoback as his "boss", he knew he was employed by all of the members of the group. He did minor repairs, although apparently not obligated to do so, and did incidental caretaking duties —shoveled snow on one occasion for Mr. Hoback, turned off lights when forgotten by owners or guests. "If I see anything that needed to be done, I went and done it." On the issue that his employment was carried on by his employers for pecuniary gain, he testified that the floathouses were the summer homes of their respective owners; that they and their families came down there to relax, mostly week ends; he couldn't say whether Hoback entertained his store employees there; that he had had friends and relatives there occasionally, as had other members of the group. Asked if, during his two and a half years of employment at Beauty Bay, he had observed any guests that any of the owners had had there, he replied.

"Oh, nothing more than their families come down there week ends. They

didn't come regularly, but they come whenever they felt like it, I guess."

Hoback testified that he regarded the floathouse as connected with his business; that he maintained it for the entertainment of guests and employees for the purpose of promoting the good will of his business at Kellogg, as well as for the enjoyment of his family; that he thought 50% of his expense in connection with it was for the promotion of his business.

Mr. Albinola, an automobile dealer at Kellogg and an owner of one of the floathouses, testified that he maintained his floathouse as a part of his business as a means of promoting good will and automobile sales; that the group did not maintain their floathouses on a commercial basis, that is, they were not rented, nor the project commercialized in such a way as to provide a direct income to the owners; that they were maintained for their own families and guests. Mr. Albinola's compensation liability was insured by the State Insurance Fund.

Mr. John Gales, another member of the group, and an automobile dealer at Wallace, likewise testified that he regarded the expense of maintaining his floathouse as partly chargeable to his business; that he entertained prospective purchasers there.

The record does not show whether any of the other eight members of the group maintained their floathouses in connection with their business undertakings, and it does show that some of them were not employers at all, other than as members of this group in the employment of claimant.

Mr. Albinola and Mr. Hoback, acting for the group, made the agreement with the owner for the use of the land on Beauty Bay. This owner refused to lease the land for any commercial uses, but when assured by them that the group would use it only as a location for their floathouses and for the enjoyment of their families and friends, and that it would not be devoted to any commercial purposes, he gave them permission to so use it, to construct a road to it, and to build a cabin on it for their caretaker. In return the group agreed to pay the owner's taxes.

■ Assuming that the three owners were correct in regarding the maintenance of their floathouses as a part of their businesses, and that thus a portion of claimant's employment was connected with those businesses, such portion would be a relatively small and not a substantial part of his total employment. Primarily the floathouses were maintained for the enjoyment and relaxation of the families and friends of the owners and not for pecuniary gain. These properties being primarily devoted to domestic purposes, claimant's employment was likewise properly characterized as domestic.

■ Finally, it is without dispute that claimant was not an employee of the Kellogg Variety Store, and the Hobacks were

436

not his employers. He was employed by the unorganized group of floathouse owners. The group was his employer. "'Employer,' unless otherwise stated, includes any body of persons, corporate or unincorporated, * * *", § 72–1010, I.C. The insurer of Hoback's variety store employees cannot be made liable for compensation due to an employee of another separate and distinct employer, whose employee it has not insured. Moon v. Ervin, 64 Idaho 464, 133 P.2d 933.

 Appellant (claimant) contends that since Hoback consulted with the surety's local agent and followed his suggestion in adding claimant's wages to his variety store payroll, the surety is bound by the agent's action. It appears highly doubtful that the agent was acting within the scope of his agency. 44 C.J.S., Insurance, § 152. To his testimony that he did not advise either the general agent or the surety company of the addition of the watchman's wages to the variety store payroll, the agent testified that he did not advise Mr. Hoback that he would have to enter into an election of coverage with the surety, because he, himself, did not know that such an election was required by the law. It would seem there was some duty on Hoback to check this question of the watchman's coverage with the surety's auditor when the latter called to audit Hoback's payroll report. In any event, under the circumstances, we do not think Hoback's surety is estopped to deny the coverage,

Kindall v. McBirney, 52 Idaho 65, 11 P.2d 370, or required to assume a liability to an employer it did not insure. Moon v. Ervin, 64 Idaho 464, 133 P.2d 933.

The order is affirmed. Costs to respondents.

PORTER, C. J., and GIVENS, THOMAS and KEETON, JJ., concur.